## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,             CRIM. NO. 14-20154

                    Plaintiff,         HON. BERNARD A. FRIEDMAN

v.

CHRISTOPHER LAJUAN TIBBS,

                    Defendant.
_____/

### United States' Response Opposing the Defendant's
### Motion for Compassionate Release (ECF No. 85).

Defendant Christopher Tibbs seeks compassionate release under 18 U.S.C.

§ 3582(c)(1)(A)(i). This motion should be denied, given that the defendant has

been vaccinated against COVID-19 and therefore does not present an extraordinary

and compelling reason permitting relief. He also has not presented any proof of a

medical condition that, according to CDC guidance, places him at enhanced risk

during the current pandemic; and the danger that the defendant presents to the

community, the time remaining on his sentence, and all other considerations under

18 U.S.C. § 3553(a) weight strongly against his release.

## I.    Background

### A.    Criminal Conduct

Tibbs was a leader of the Vice Lords' Michigan branch, called the Mafia

Insane Vice Lords. *United States v. Tibbs*, No. 15-1060, 685 Fed.Appx. 456, 458

(6th Cir. Apr. 10, 2017). In September 2013, he met with four gang members and
prospects to discuss robbing a Little Caesars restaurant in Redford Township,
Michigan. *Id.* Tibbs, in his role as "chief enforcer" for the gang, "bless[ed] the
robbery." *Id.* at 466. He advised the four on how to commit the robbery; he told
them they needed weapons, face masks, and gloves. *Id.* at 458, 467. Tibbs also
supplied walkie-talkies. *Id.* at 466-67. The next day, they committed the robbery as
instructed. *Id.* at 458. Afterwards, the robbers met with Tibbs, celebrated, got
tattoos, and gave a large portion of the money to Tibbs. *Id.* Tibbs used the money
to pay for the group to attend a Vice Lords reunion in Chicago. *Id.* The government
recovered paperwork from the house where the robbery was planned which
described the Vice Lords' organizational structure and rules, including the
requirement that certain members in the gang must have two-way long-range
walkie-talkies. *Id.* at 467. And, in Tibbs's bedroom in a different house, the
government found gang-related paperwork and a document noting the purchase of
walkie-talkies. *Id.* at 467.

After a jury trial in August 2014, Tibbs was convicted of aiding and abetting
Hobbs Act robbery, 18 U.S.C. §§ 2 and 1951(a), aiding and abetting possession of
a firearm in furtherance of a crime of violence, 18 U.S.C. §§ 2 and 924(c), and a
street-gang enhancement, 18 U.S.C. § 521. He was sentenced to 262 months for

the robbery and 84 months for the firearm offense, consecutive, for a total sentence of 346 months imprisonment.

Tibbs began serving his prison sentence on April 30, 2015, and is currently incarcerated at McKean FCI in Pennsylvania. He is 45 years old, and his projected release date is June 16, 2039. He has served approximately 89 months, has credit for good conduct time of approximately 5 months, for total time served of approximately 94 months. Tibbs has an extensive record of discipline while in the custody of BOP. (Ex. 4: BOP Disciplinary Records)(under seal). He has had eight separate disciplinary cases for violations including refusing to obey orders and possession of drugs or alcohol (twice), among other things. (*Id.*).

**B.    Request for Compassionate Release**

Tibbs previously filed a pro se motion for compassionate release on April 8, 2020 (ECF No. 67). That motion was denied for failure to exhaust administrative remedies pursuant to *United States v. Alam*, 960 F.3d 831 (6th Cir. 2020). (ECF No. 76).

Tibbs filed a second pro se motion for compassionate release on May 26, 2020. (ECF No. 77). Therein, Tibbs claimed he suffers from obesity and asthma, but offered no support for that claim, nor any support that those conditions would "increase the risk to his health and safety to such an extent that the Court should deem him to be an appropriate candidate for compassionate release." (*See* ECF No.

- 3 -

81: Order Denying Second Motion for CR). The Court denied his motion for compassionate release on the merits, as Tibbs had then exhausted his administrative remedies. (ECF No. 81). The Court noted that Tibbs had not met his burden of proving extraordinary and compelling reasons for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). (*Id.*).

Tibbs has now filed a third motion for compassionate release on August 17, 2021, this time represented by counsel. (ECF No. 85). Prior to filing the third motion, Tibbs did not raise his new claims first to the Bureau of Prisons. Tibbs again claims to have asthma without factual support. The only new circumstance presented by Tibbs is that he contracted COVID-19 in January 2021. This claim is supported by his medical records, although he remained asymptomatic and recovered. (Ex. 3: 2021 BOP Medical Records at 13-15)(under seal). And in August 2021, after refusing vaccination multiple times, Tibbs finally agreed to receive the Moderna vaccine and was vaccinated against Covid-19.

Thus, although Tibbs previously satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A), this Court already denied a compassionate release motion on those same grounds. To the extent the instant motion rehashes issues already decided by this court, it is really an untimely motion for reconsideration of this Court's denial of his previous motions. And, his administrative remedies as to the new basis in the instant motion, that he

contracted Covid-19, have not been exhausted, because he never presented this new claim to the Bureau of Prisons as grounds for relief. *See* (Ex. 1: Warden CR Denial); *United States v. Cole*, 18-20237, 2021 WL 1540873 (E.D.Mich. Apr. 20, 2021) (Goldsmith, J.) (noting that some courts have required independent satisfaction of the exhaustion requirement for successive compassionate release motions and citing *United States v. Cain*, No. 16-00103, 2021 WL 388436, at *4 (D.Me. Feb. 3, 2021), in turn citing *United States v. Franco*, 973 F.3d 465, 468 (5th Cir. 2020)).

A review of the defendant's medical records Since 2015 provide no indication whatsoever that the defendant suffers from asthma, as he continues to claim in his motion for compassionate release. (Ex. 2: 2020 BOP Medical Records; Ex. 3: 2021 BOP Medical Records; ECF No. 70, PageID.884 at fn 1; and Ex. A-F thereto)(all under seal). As noted by the government in its response to his last motion for compassionate release, his medical records back through 2015 contained no reference to any treatment or diagnosis for asthma either. (ECF No. 70, PageID.884 at fn 1; and Ex. A-F thereto (under seal)). In fact, despite his claim in his motion to have asthma, the very excerpt of his medical records the defendant filed as exhibit to his motion contradicts that claim. (ECF No. 85, PageID.1105-1106, "Pulmonary Observation/Inspection, Yes: Within Normal Limits", "pt wants

to know if because he had acute bronchitis years ago if that is the same as asthma").

The defendant is obese; however, although he does not claim obesity as grounds for relief. As of August 21, 2020, he was 69 inches tall and weighed 232 pounds, which would be a BMI of 34.3. (Ex. 2: 2020 BOP Medical Records at 6).

However, the defendant received his first dose of the Moderna COVID-19 Vaccine on August 10, 2021 (after initially refusing vaccination on February 4, 2021 (Pfizer-BioNTech), April 29, 2021 (Janssen), and April 30, 2021 (Moderna)). (Ex 3: 2021 BOP Medical Records at 26-7). He also tested positive for COVID-19 in January 2021, but was asymptomatic during the entire period of quarantine and recovered. (Ex 3: 2021 BOP Medical Records at 13-15, 24).

## C.    BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. The total BOP population is now more than 10% less than it was at the outset of the pandemic, standing at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful, now abetted by widespread vaccination (discussed below). It is notable that the rate of deaths in federal prisons has been comparable to that in the general U.S. population, a notable achievement

- 7 -

given the known risks of viral spread in a congregate prison setting. Further, the incidence of positive cases in all BOP institutions has been sharply declining for months, with nearly all institutions currently reporting no cases or case tallies in the single digits.

Specifically as it relates to the defendant, BOP's aggressive efforts have extended to FCI McKean. That institution houses 981 inmates. At present, there are 0 inmates who are reported positive, and are isolated while they are treated/recover. There are also 410 current inmates who previously tested positive and have recovered. There has not been a COVID-related death at this institution. The latest statistics are available at www.bop.gov/coronavirus.

**D.    Vaccinations**

BOP worked with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP received the COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines.

As of this writing, through an intensive effort over the past months, BOP has offered a vaccine to every inmate in BOP-managed institutions. BOP has

- 8 -

administered a total of 219,710 doses to inmates and staff. Going forward, BOP will continue to offer vaccines to newly arrived inmates, and to those inmates who initially declined a vaccine if they change their minds, as expeditiously as possible as supplies are available.

At FCI McKean, where the defendant is held, BOP has fully vaccinated 28 staff members, and 817 inmates (which is 83% of the current inmate population, and does not account for those additional inmates who declined vaccination).

The clinical guidance provided to BOP health services professionals is available at

https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at

https://www.bop.gov/coronavirus/, and is updated every weekday.

## II.   Discussion

### A.   Governing Law

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Although the Sixth Circuit has

concluded that this policy statement is not currently binding in connection with motions filed by defendants, *see United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021), the courts of appeals have recognized that it continues to provide important "guideposts." *United States v. McGee*, 992 F.3d 1035, 1048 (10th Cir. 2021); *see United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.").

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. First, the defendant must not be a danger to the community, then, the defendant must have a reason such as a terminal illness or serious medical condition from which they will not recover and cannot provide self-care for within the institution; are elderly and suffering serious physical or mental health deterioration as a result; or certain family circumstances. The note also provides for other reasons, still subject to the lack of dangerousness consideration for other reasons as determined by the Director of the Bureau of Prisons.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g., United States v. Neal*, 2020 WL 5993290,

at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.). As the terminology in the statute

makes clear, compassionate release is "rare" and "extraordinary." *United States v.*

*Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

That statutory requirement means that a defendant's reasons for release must

satisfy two strict criteria. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's reasons

must be "extraordinary"—meaning exceptional or uncommon. *United States v.*

*Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United*

*States v. Sapp*, No. 14-CR-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31,

2020). The reasons must also be "compelling"—meaning "so great that irreparable

harm or injustice would result if the relief is not granted." *Sapp*, 2020 WL 515935,

at *3. A defendant must establish both criteria to satisfy the statute's eligibility

threshold. Tibbs has satisfied neither.

### B.    COVID-19 and Compassionate Release

The fact of the COVID-19 pandemic, which poses a general threat to every

non-immune person in the country, does not alone provide a basis for a sentence

reduction. The guideline policy statement describes specific serious medical

conditions afflicting an individual inmate, not generalized threats to the entire

population.

The government acknowledges, however, that an inmate who has not been

offered a vaccine, who presents a risk factor identified by the CDC as increasing

the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at \*5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.)

The CDC's list of risk factors appears at

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.

### C.   The Defendant's Circumstances

Here, the defendant does appear to have the risk factor of obesity, although he does not argue it in his motion. Regardless, he no longer presents an "extraordinary and compelling reason" because he has been vaccinated. As a result, the defendant's motion for compassionate release should be denied.

As the government has explained, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or

- 13 -

medical condition . . . that substantially diminishes the ability of the defendant to

provide self-care within the environment of a correctional facility and from which

he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). The

government during the pandemic has acknowledged that an unvaccinated inmate

who presents a medical risk factor identified by the CDC as increasing the risk of

an adverse outcome from COVID-19, and who is not expected to recover from that

condition, presents an extraordinary and compelling circumstance under that

provision.

That circumstance does not exist here, as the available vaccines permit

effective self-care against severe illness or death that may be caused by the

coronavirus. The CDC states that the vaccines are "safe and effective," and

"[g]etting vaccinated prevents severe illness, hospitalizations, and death."

https://www.cdc.gov/aging/covid19/covid19-older-adults.html (accessed Aug. 13,

2021).

The vaccines were the subject of extensive clinical trials before

authorization, which revealed high effectiveness in preventing infection, and

particularly in preventing severe illness or death. The data thus far show

remarkable success in the real world. The CDC reports that as of August 2, 2021,

there are more than 164 million Americans who have been fully vaccinated. Within

that group, only approximately 5,000 hospitalizations from symptomatic

"breakthrough infections" have been reported, and only approximately 1,200 deaths (0.00073%). https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (accessed Aug. 12, 2021). These data suggest a level of risk from COVID-19 of a vaccinated person far less than that faced by prisoners and all other persons from myriad other ailments and hazards of daily life.

There has been widespread recent reporting that the Delta variant of COVID-19 is now the most prevalent variant causing new infections in the United States, posing a significant risk to unvaccinated persons. The CDC reports, however, that the approved vaccines are proving highly effective against the Delta variant, stating, "FDA-authorized COVID-19 vaccines protect against Delta and other known variants." The CDC adds: "Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. Some breakthrough infections are expected, but remain rare. . . . All vaccines are particularly effective against severe illness, hospitalization and death."[1]

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Ftransmission%2Fvariant.html (accessed Aug. 12, 2021); *see also* https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (accessed Aug. 12, 2021) ("Vaccines in the US are highly effective, including against the Delta variant.").

Accordingly, once a vaccine is available to an inmate, compassionate release is not warranted based on the threat of COVID-19 alone. *See United States v. Reed*, 2021 WL 2681498, at *4 (E.D. Pa. June 30, 2021) (Schmehl, J.) ("Now that COVID-19 vaccinations are being administered throughout the Bureau of Prisons, compassionate release motions [based on COVID-19] generally lack merit.").

Courts have agreed with this conclusion almost unanimously. Courts routinely deny relief to an inmate who has been vaccinated. *See United States v. Wills*, 2021 WL 2179256, at *1 (D. Or. May 27, 2021) (Brown, J.) (citing many cases).

In sum, absent a significant change in the current scientific assessment regarding the efficacy of the vaccines, the advent of widespread vaccine availability should bring to an end the unprecedented period in which compassionate release has been available based on the threat of the virus. Instead, sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (relief is "rare" and "extraordinary"). At present, the defendant does not present any such condition.

In addition, the only risk factor supported by the evidence for the defendant is obesity, with a body mass index (BMI) of 34.3. On March 29, 2021, the CDC

revised its list of risk factors to state that any BMI over 25 "can make you more likely" to suffer severe disease. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed Aug. 12, 2021).

The government maintains that this condition, where a vaccine has not been offered, qualifies as an "extraordinary and compelling" reason under present circumstances. The government recognizes, however, that courts have often denied compassionate release based on mild obesity alone, particularly where the defendant is relatively young and does not present any related ailment.[2] In addition, courts have adhered to that view following the March 29, 2021, revision. *See, e.g.*, *United States v. Lucero*, 2021 WL 1297828, at *2 (S.D. Cal. Apr. 7, 2021) (Sabraw, J.) (BMI of 29 does not warrant release); *see also United States v. Pearson,* 2020 WL 7706618, at *3 (E.D. Mich. Dec. 29, 2020) (Parker, J.) (borderline obesity in 25-30 BMI range is not sufficient; "This Court is reluctant to

---

[2] *See, e.g.*, *United States v. Gonzalez*, 2021 WL 662496, at *2 (E.D. Pa. Feb. 19, 2021) (Pappert, J.) (even though the government states that obesity "permits consideration for compassionate release during the pandemic," "numerous courts in this Circuit have held that a BMI around or moderately above 35 is insufficient to present an extraordinary and compelling reason that may warrant release.") (citing cases); *United States v. Edison*, 2020 WL 3871447, at *3 (D. Minn. July 9, 2020) (Frank, J.) (obesity alone (BMI of 35.4) "fails to meet the demanding standard for compassionate release."); *United States v. Aguilar*, 2020 WL 6081779, at *4 (N.D. Cal. Oct. 15, 2020) (Koh, J.) (relief denied to 27-year-old with BMI of 37.5; the court cites numerous cases and "notes that other courts have declined to grant compassionate release to otherwise healthy and young inmates with obesity as their only cognizable risk factor, absent other indications of serious medical risk.").

find extraordinary and compelling circumstances warranting the release of inmates where the CDC's guidelines reflect only a possible heightened risk of severe illness from COVID-19, particularly where the condition at issue is one experienced by almost three quarters of the United States population over age twenty."); *United States v. Magnus*, 2021 WL 1627290, at *2 (D.S.D. Apr. 27, 2021) (Schreier, J.) (obesity with BMI of 32.3 is not sufficient); *United States v. Odle*, 2021 WL 1820267, at *4 (D.S.D. May 6, 2021) (Viken, J.) (even after the March 29 revision, obesity alone with a BMI of 30.6 is not sufficient to state an extraordinary factor); *United States v. Contreras*, 2021 WL 1536504, at *5 (E.D. Tex. Apr. 19, 2021) (Crone, J.) (even following the March 29 update, being overweight with a BMI of 25.5 is not sufficiently extraordinary).

The Court need not adopt that reasoning here, however, given the defendant's vaccination and personal circumstances, as set forth below, which weigh heavily against relief.

It also bears noting that the defendant contracted COVID-19 and, fortunately, apparently recovered from it without significant consequence. We cannot say that this eliminates all risk, but it appears to diminish the risk significantly.

In a peer-reviewed study recently reported by the CDC, https://www.cdc.gov/library/covid19/05072021_covidupdate.html (accessed Aug.

12, 2021), 9,119 patients with COVID-19 infection received serial tests between December 1, 2019, and November 13, 2020, in 62 healthcare facilities in the United States. The rate of reinfection (defined as a positive test more than 90 days after resolution of the first infection) was 0.7% (a total of 63 patients). The mean number of days between the two positive tests was $116 \pm 21$. The scientists found that reinfection appeared to present less severe symptoms than the first infection, and of the 63 patients who presented reinfection, there were only two deaths. The mortality rate of those who recovered from the first infection was therefore 0.022%.

This result is particularly compelling where, as here, an inmate who recovered has now been offered a vaccine. *See, e.g.*, *United States v. Roe*, 2021 WL 1711296, at *2 (S.D. Ohio Apr. 30, 2021) (Sargus, J.) (inmate recovered from COVID and received Pfizer vaccine, and therefore is not eligible for relief notwithstanding conditions including diabetes and heart, kidney, and respiratory ailments).

For all of these reasons, compassionate release is not warranted here. Further, even if the defendant were at elevated medical risk, relief should be denied. This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community.

At present, these considerations—including the defendant's risk of danger to the community, his vaccination, and BOP's strenuous efforts to protect inmates against the spread of COVID-19—counsel strongly against relief.

The defendant continues to present a danger to the community and should be required to serve the sentence that this Court imposed for his criminal conduct. He was a leader of the Michigan branch of the Mafia Insane Vice Lords, a violent street gang that remains active throughout the Midwest. *Tibbs*, 658 Fed.Appx. at 458. During his incarceration, Tibbs continues to rack up infractions, including serious ones involving the possession of drugs while in prison. Based upon all of these violations, Tibbs clearly has not shown any progress toward rehabilitation.

Tibbs has only served a portion of the lengthy prison term this Court previously found to be necessary to protect the public from further crimes of the defendant. *Tibbs*, 658 Fed.Appx. at 469 (quoting this Court, "I think the need for—imposition of his sentence that will deter not only this defendant but others, especially others in this arena, this kind of arena, that was happening here. I think to protect the public is an important consideration.")

Tibbs role in the gang was described by co-conspirators at trial as "chief enforcer."  He planned a robbery for four other gang members and instructed them how to do it, including the use of firearms, masks, and gloves, and to return the proceeds of the robbery to him. The other four gang members followed his

instructions.

Tibbs also has a lengthy criminal history. In 1994, he was convicted of two counts of armed robbery and felony firearm. He was sentenced to 2 years and 7 months in prison. (Mich. 3rd Cir. 94-002485-02-FC). In 2003, he was convicted of an attempted controlled substance offense and sentenced to probation. (Mich. 3rd Cir. 03-006568-01-FH). His probation was extended after a violation in 2005 and then unsuccessfully terminated in 2006 after another violation. (*Id.*). In 2009, Tibbs was convicted of delivery/manufacture of cocaine, less than 50 grams, and sentenced to 24 months of probation. (Mich. 3rd Cir. 09-005370-01-FH). Tibbs again violated his probation. In 2011, his probation was terminated, and he was sentenced to jail. (*Id.*).

This Court previously found that the within-Guidelines sentence of 346 months imprisonment was necessary to protect the public from this defendant as well as to fulfill all of the other purposes of sentencing set forth is 18 U.S.C. § 3553(a). That finding was well supported by Tibb's offense conduct, criminal history and repeated failure to abide by the law and follow orders while on supervision. His failure to follow institutional rules, while not unexpected given his past, demonstrates that nothing has changed to this point that would impact the analysis of the factors under 18 U.S.C. § 3553(a) for Tibbs. Tibbs was dangerous to this community in 2014 and remains so today.

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully submitted,

SAIMA S. MOHSIN,
Acting United States Attorney

*s/ Andrew R. Picek*
ANDREW R. PICEK
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9652
E-Mail: andrew.picek@usdoj.gov
Bar No. OH0082121

Dated: September 10, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 10, 2021. I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all counsel of record.

<div style="margin-left: 40%;">

*/s/ Andrew R. Picek*
ANDREW R. PICEK
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9652
E-Mail: andrew.picek@usdoj.gov
Bar No. OH0082121

</div>